**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

Ryan Mack

Plaintiff,

v.

Les Roberts, et al.

Defendants.

Court File No.: 13-cv-00197 (SRN/JJG)

**LEGAL MEMORANDUM IN SUPPORT OF BRITTO CENTRAL, INC.'S, MAGICAL THINKING ART, INC.'S & ROMERO BRITTO'S MOTION TO DISMISS**

---

Britto Central, Inc. ("BCI"), Magical Thinking Art, Inc. ("MTA") (both together, "the Britto Companies"), and Romero Britto (the "Artist") (all collectively the "Britto Parties") by and through their undersigned counsel, hereby file their Memorandum of Law in support of their Motion to Dismiss Plaintiff's claims asserted against them, and in support thereof, state as follows:

## I. INTRODUCTION

Plaintiff Ryan Mack, a professional art dealer and sophisticated businessman located in Minnesota, inexplicably and illegally seeks to hold an innocent artist, who is a resident of Florida and with whom Mack has had no business or other contacts, responsible for the bad acts of unrelated, third party art forgers which the Artist had absolutely no control over. Mack claims that he was the alleged victim of an elaborate fraud perpetrated by defendants Les Roberts, Silvia Castro, Coral Gables Galleries, Inc., "Britto in the Grove[1]," and "Max in the Grove" (collectively, the "Roberts Defendants"),

---

[1] There is not and has never been any company officially organized or doing business as

and claims that he unknowingly purchased paintings falsely attributed to the Artist from the Roberts Defendants.

Mr. Mack's attempt to hale the Britto Parties into court in the State of Minnesota is fatally defective however, as the Court is without personal jurisdiction over the Britto Parties. Furthermore, to the extent that any intelligible allegations against the Britto Parties can be culled from Plaintiff's Complaint, such allegations fail to state any cognizable claim upon which relief could be granted. As such, Plaintiff's alleged causes of action against the Britto Parties for negligence and negligent misrepresentation (mislabeled in the Complaint as "intentional" misrepresentation) are properly dismissed pursuant to Fed. R. Civ. P. 12(b)(2), and 12(b)(6).

## II. BACKGROUND

Romero Britto (the "Artist"), a resident of the State of Florida, is a world famous pop artist. *See*, February 19, 2013 Declaration of Stephanie Marie Pomares, ¶ 4 (hereinafter, the "Pomares Declaration"); February 19, 2013 Declaration of Mia Widmar, ¶ 4 (hereinafter, the "Widmar Declaration"); and February 19, 2013 Declaration of Romero Britto, ¶ 3 (hereinafter, the "Artist Declaration"). BCI owns and operates a retail art gallery located in Miami Beach, Florida that sells the Artist's original paintings, as well as limited edition fine art and other articles bearing the visual artwork of the Artist. Pomares Declaration, ¶ 4. MTA is a Florida business that engages in the wholesale sale

"Britto in the Grove" in the State of Florida. *See* www.sunbiz.org. To the extent that any business ever unofficially operated as such, it was certainly not owned, operated or controlled by any of the Britto Parties. Pomares Declaration, ¶ 6-7.

of the Artist's fine art to other art galleries around the world. *Id*.; Widmar Declaration, ¶ 4.

This lawsuit arises out of the conduct of third parties wholly unrelated to any of the Britto Parties. Pomares Declaration, ¶ 7-8. Plaintiff alleges bad acts by third parties, which Plaintiff identifies as defendants Les Roberts, Silvia Castro, Coral Gables Galleries, Inc., "Britto in the Grove," and "Max in the Grove" (collectively, the "Roberts Defendants"). Plaintiff alleges that the Roberts Defendants sold him counterfeit paintings represented to be by the hand of the Artist, and Plaintiff claims he was not aware that the paintings were forgeries. In an attempt to bootstrap the innocent Artist to his litigation against the Roberts Defendants, Plaintiff also tacks on to his Complaint unfounded and dilatory claims against the Britto Parties. As made clear from the face of the Complaint, any of Plaintiff's alleged interactions with any individuals who are alleged to be associated in some way with any of the Britto Parties fail to state any cognizable cause of action. In addition to failing to state any claim against a Britto Party, Plaintiff's Complaint is untenable because this Court is unable to extend personal jurisdiction over any of the Britto Parties. Thus, Plaintiff's alleged claims against the Britto Parties thoroughly fail on multiple alternative and independent grounds. These grounds for dismissal are set forth in detail below.

## III. ARGUMENT

### A. Plaintiff's Claims Against the Britto Parties Must Be Dismissed for Lack of Personal Jurisdiction.

#### 1. Plaintiff Bears the Burden of Proving Personal Jurisdiction.

To survive a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Plaintiff must make a *prima facie* showing that jurisdiction exists. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996); *Digi-Tel Holdings, Inc. v. Proteq Telecomm., Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996). Once a defendant challenges the court's exercise of personal jurisdiction, the plaintiff shoulders the burden of establishing personal jurisdiction with specific facts as shown by testimony, affidavits, or other documentation. *Dever v. Hentzen Coatings*, 380 F.3d 1070, 1074 (8th Cir. 2004). Pleadings alone are not enough. *Id.* at 1072. Plaintiff has failed to and cannot meet his burden in this case.

A federal court may assume personal jurisdiction to the extent permitted by the long-arm statute of the forum state. *Id.* at 1073. The Minnesota long-arm statute has been construed to confer personal jurisdiction to the fullest constitutional extent allowed under the due process clause. *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410-411 (Minn. 1992). Thus, the court's inquiry in this case will focus on the limits imposed by the due process clause of the United States Constitution. *Bible & Gospel Trust v. Wyman*, 354 F.Supp.2d 1025, 1027 (D. Minn. 2005), *citing Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 818 (8th Cir. 1994).

The due process clause requires that there be "minimum contacts" between the Britto Parties and Minnesota before this Court may exercise jurisdiction over them. *Wyman*, 354 F.Supp.2d at 1027-28, *citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). The minimum contacts between a non-resident and the forum state must be such that "maintenance of the suit does not offend traditional notions of fair

play and substantial justice." *World-Wide Volkswagen Corp.*, 444 U.S. at 291-292. For a finding of minimum contacts, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). "Purposefully availing" means that the non-resident must have had some contact with the forum state that is **<u>more</u>** than random, fortuitous, or attenuated. *Guinness Import Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 614 (8th Cir. 1998) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (emphasis added). Put another way, the non-resident's conduct and connection with the forum state must be strong enough that he, she, or it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.*, 444 U.S. at 297.

Because the Britto Parties lack sufficient contacts with the State of Minnesota, maintenance of Plaintiff's alleged claims in the State will not comport with due process, and the exercise of personal jurisdiction by Minnesota will not lie.

### 2. The Court Lacks Specific or General Jurisdiction Over the Britto Parties.

The U.S. Supreme Court has outlined two methods for evaluating the sufficiency of a non-resident's minimum contacts with a forum state: (1) general jurisdiction, and (2) specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984). Under the theory of "general jurisdiction," the court may exercise personal jurisdiction over the Britto Parties if the Britto Parties have had "continuous and systematic" contacts with the state of Minnesota. *Id*. On the other hand, specific

jurisdiction does not require "continuous and systematic" contacts with the forum state, but rather requires that the alleged causes of action specifically arise or are related to the non-resident's actions within the forum state. *Lakin v. Prudential Securities, Inc.*, 348 F.3d 704, 707 (8th Cir. 2003).

In the 8th Circuit, a five factor test is applied to evaluate the sufficiency of a non-resident's contacts, affording the first three factors primary significance: 1) the nature and quality of the defendant's contacts with the forum state; 2) the quantity of such contacts; 3) the relation of the cause of action to the contacts; 4) the interests of the forum state in providing a forum for its residents; and 5) the convenience of the parties. *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008), *citing Burlington*, 97 F.3d at 1102 (hereinafter, the *Burlington* factors). The third factor applies only in the context of a specific jurisdiction analysis, and is immaterial when evaluating general jurisdiction. *Id*.

It is evident from the face of Plaintiff's Complaint, coupled with the declarations of the Artist, Ms. Stephanie Marie Pomares, and Ms. Mia Widmar, that the Britto Parties have no contacts that would justify this Court's exercise of either general or specific jurisdiction over any of the Britto Parties.

**(i) The Britto Parties Are Not Subject to This Court's General Personal Jurisdiction**

As stated above, in order to establish "general" personal jurisdiction, a non-resident must have "continuous and systematic" contacts with the forum state. *Burlington*, 97 F.3d at 1102. Courts look to certain standard criteria to determine whether a non-resident has continuous and systematic contacts with a forum state. *See*,

*e.g.*, *Dever*, 380 F.3d at 1073 (finding no general personal jurisdiction where non-resident defendant was not incorporated in, nor had its principal place of business in the forum state; was not registered to do business in the forum state; and had no offices, real estate, bank accounts, or agents in the State); *Guinness Import Co.*, 153 F.3d at 614 (affirming lack of personal jurisdiction over nonresident defendant who was not licensed to do business in the forum state, had no bank accounts, phone number, or mailing address in the state, and did not own property or have agents for service of process in the State).

Plaintiff makes no credible allegation in the Complaint that would support general personal jurisdiction over the Artist or the Britto Companies. Indeed, Plaintiff cannot truthfully make any such allegations. As explained in detail below, the Britto Parties' contacts with the State of Minnesota range from the non-existent (for the Artist in his personal capacity), to the insignificant and sporadic (for BCI and MTA).

**<u>No Grounds for General Jurisdiction Over BCI</u>**

BCI's primary business is the operation of an 8,000 square foot art gallery/concept store located on Miami Beach's famous Lincoln Road ("the Gallery"). Pomares Declaration, ¶ 9. The Gallery deals exclusively in the sale of fine artwork by the Artist, as well as the sale of "giftware" type merchandise incorporating the artwork and designs of the Artist. *Id*.

BCI is a Florida corporation, and BCI does not have any bank accounts or property in Minnesota. Pomares Declaration, ¶ 5. BCI has never incurred or paid taxes in Minnesota. *Id*. BCI is not registered to transact business in Minnesota, nor does BCI have

a business, office, telephone number, agent for service of process, employee or any other presence in Minnesota. *Id*.

The Gallery does not advertise or solicit business in Minnesota, or otherwise purposefully direct its activities at the State of Minnesota in any way whatsoever. Pomares Declaration, ¶ 10. In light of the Gallery's location on the famous tourist destination Lincoln Road, many of its patrons are from out of town, in fact from all over the world. Pomares Declaration, ¶ 11. Listed on the National Register of Historic Places, the Lincoln Road Mall, a pedestrian-only shopping thoroughfare, attracts over 3 million visitors annually – approximately 40% of the total number of visitors to Miami Beach every year.[2] Thus, it is statistically inevitable that some visitors from Minnesota have patronized the Gallery; to characterize any sales to such Minnesota residents as anything other than random, attenuated, and fortuitous strains credibility.

Because of its character as an interstate and international tourist destination, the Gallery will often ship purchases to the home residences of its out of town customers as an added value service. *Id*. In an effort to come up with some metric to express the infinitesimally insignificant amount of business transacted by the Gallery with Minnesota residents, BCI reviewed its records with regard to the number of out-of-town shipments to Minnesota for the year of 2012. In 2012, the Gallery shipped approximately 55,000 items to out of town customers who made their purchases at the Gallery in Miami Beach. Pomares Declaration, ¶ 12. BCI's records reflect that approximately 57 of those 55,000

[2] *Miami Beach Economic Indicators*, Official Website of the City of Miami Beach, http://miamibeachfl.gov/econdev/ (follow "Statistics" hyperlink) (last visited February 15, 2013).

items were shipped to Minnesota. *Id*. Thus, items shipped to Minnesota comprised approximately .001 % of the Gallery's items shipped to interstate and international destinations in 2012. *Id*. This percentage is approximately representative of the amount of items the Gallery ships to Minnesota in any given year. *Id*. This *de minimis* amount of transactions by BCI with Minnesota residents, who were in the State of Florida when they made their purchases are *de facto* random, fortuitous and attenuated contacts with the State of Minnesota.

BCI has also purchased certain inventory items from a fabricator in Minnesota, for resale at the Gallery. Pomares Declaration, ¶ 13. This fabricator in Minnesota is one of dozens of fabricators around the world that BCI engages to produce various items. *Id*. BCI's inventory consists of approximately 10,178 "SKUs" (stock keeping units). Pomares Declaration, ¶ 14. Of those 10,178 SKUS, items from the Minnesota fabricator account for 7 SKUS. *Id*. Thus the portion of items purchased by BCI that just coincidentally happen to come from Minnesota is about .0007%. *Id*. Furthermore, it is BCI's general policy that all of its vendors agree to the State of Florida as the source of law governing all transactions and the exclusive venue for the resolution of all disputes. Pomares Declaration, ¶ 15.

BCI has one other cognizable business contact in the State of Minnesota. In May 2012, BCI hired an accounting firm located in Minnesota (the "Firm") to do work on certain projects. Pomares Declaration, ¶ 16. Whenever it does work for BCI, the Firm's employees come to BCI's offices in Miami to perform the work. *Id*. The Firm is one of several accounting firms BCI uses and has used, the rest of which are located in the State

of Florida. *Id*. The firm was referred to BCI by contacts located in Florida, and just coincidentally happens to be located in Minnesota. *Id.*

As such, the nature of these two random isolated business relationships, one with a Minnesota vendor among dozens of other service providers around the world for a negligible proportion of items, and the other the coincidental nascent retention of a Minnesota accountant, among others, coupled with Minnesota tourists *coming into Florida* and making purchases at the Gallery cannot qualify as BCI "purposefully avail[ing] itself of the privilege of conducting activities within [Minnesota], thus invoking the benefits and protections of its laws." *Digi-Tel Holdings*, 89 F.3d at 522, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also Helicopteros*, 466 U.S. at 418 ("[W]e hold that mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident [party] in a cause of action not related to those purchase transactions.").

To summarize, none of BCI's intermittent and ancillary contacts with Minnesota can be characterized as BCI "purposefully avail[ing] itself of the privilege of conducting activities within Minnesota," and none of these marginal and insubstantial contacts are in any way related to the alleged claims set forth in Plaintiff's Complaint. Based on these facts, there can be no question that any contacts that BCI has had with Minnesota is *de minimis*, random, fortuitous and attenuated. Thus the primary *Burlington* Factors ( (1) the nature and quality of the defendant's contacts with the forum state; and (2) the quantity of

such contacts[3]) clearly weigh against this Court extending general personal jurisdiction over BCI. *See, e.g. Dever*, 380 F.3d at 1074 (when nonresident's business contacts were *de minimis* and not "continuous and systematic" contacts with the forum state, the district court had no basis to exercise general personal jurisdiction).

With regard to the "secondary" *Burlington* factors ((4) the interests of the forum state in providing a forum for its residents; and (5) the convenience of the parties), these factors also weigh heavily against the exercise of general jurisdiction over BCI (as well as the other Britto Parties). In considering the fourth factor, while Minnesota has an interest in providing a forum for its residents to bring claims, "Minnesota's interest in providing its residents with a forum cannot make up for the absence of minimum contacts." *Digi-Tel Holdings*, 89 F.3d at 525, *citing Falkirk Min. Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 376 (8th Cir. 1990). With regard to the fifth factor, the convenience of the parties *overwhelmingly* favors an absence of general jurisdiction in Minnesota. All eight (8) defendants are Florida residents with their primary places of business in Florida. Pomares Declaration, ¶ 4-7; Artist Declaration, ¶ 3. All witnesses with the exception of the Plaintiff would appear to be located in Florida. Moreover, there are two court cases currently pending in Florida that are inextricably intertwined with the very heart of Plaintiff's Complaint: namely the Chapter 7 bankruptcy of alleged primary actors, defendants Les Roberts and Silvia Castro, *See In re Roberts*, U.S. Bankruptcy Court for the Southern District of Miami, Case No. 11-39825, as well as the case of

[3] Per precedent, the third *Burlington* Factor is omitted in a general jurisdiction analysis. *Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir. 2006).

*Gugliotta v. Les Roberts, Silvia Castro, et al.*, 11th Circuit Court of Miami Dade County Case no. 2012-23550, wherein the Roberts Defendants are accused of the same fraudulent conduct Plaintiff alleges in his Complaint, namely the production and sale of fraudulent fine art. In light of the recent re-opening of Roberts' and Castro's Chapter 7 case, this litigation is automatically stayed against them per 11 U.S.C § 362(a). As a matter of law, Plaintiff's only available avenue for relief against Roberts and Castro is to pursue an adversary proceeding in the Bankruptcy Court for the Southern District of Florida, Miami Division. Roberts and Castro are the alleged primary actors behind the main bad acts alleged in Plaintiff's Minnesota Complaint. Without the ability to obtain discovery or testimony from the two primary defendants in the case, Plaintiff's frivolous subsidiary claims against the Britto Parties in this case are arrested. Moreover, upon information and belief, Les Roberts is under investigation in Southern Florida by the Federal Bureau of Investigation for the very conduct Plaintiff complains of here, namely, the production and sale of fraudulent fine art. *See In re Roberts*, U.S. Bankruptcy Court for the Southern District of Miami, Case No. 11-39825, Dkt # 61, filed January 2, 2013. To say that Florida is of superior convenience to the parties, as well as being the State with the primary interest in the resolution of this case, is an understatement.

In light of all the above, there are simply no credible grounds for this Court to exercise general jurisdiction over BCI.

**No Grounds for General Jurisdiction Over MTA**

MTA is separate business from BCI. Whereas BCI owns and operates the retail storefront Gallery on Lincoln Road, MTA's business involves the wholesale sale of the

Artist's fine artwork and other articles associated with the Artist to art galleries and independent retailers worldwide. Widmar Declaration, ¶ 4. MTA is a Florida corporation. *Id*. MTA does not have any bank accounts or property in Minnesota. Pomares Declaration, ¶ 6. MTA has never incurred or paid taxes in Minnesota. *Id*. MTA is not registered to transact business in Minnesota, nor does MTA have a business, office, telephone number, agent for service of process, employee or any other presence in Minnesota. *Id*.

MTA has no current clients in Minnesota. Widmar Declaration ¶ 5. MTA has never specifically targeted the State of Minnesota in its marketing efforts or purposefully directed its activities at any Minnesota residents. *Id*. There is a legacy record of one (1) MTA gallery client in Minnesota with whom MTA last transacted business in 2009. Widmar Declaration, ¶ 6. MTA has done no further business with this Minnesota gallery since 2009. *Id*.

In 2012, MTA engaged in one transaction with a Minnesota corporation, out of hundreds of clients located all over the world. Widmar Declaration, ¶ 7. MTA did not seek out this client; this Minnesota company reached out to MTA on a "cold" basis seeking MTA's services, based upon the world-wide reputation of the Artist. *Id*. Indeed, even though the order in question was placed by a Minnesota company, the items in question were actually distributed at an event that took place at the Fontainebleau Hotel in **Miami Beach, Florida**. *Id*. No further transactions have transpired between MTA and the Minnesota company. *Id*. It is estimated that this transaction with the Minnesota

corporation constituted approximately .0003% of MTA's overall business in 2012. Widmar Declaration, ¶ 8.

Given the foregoing, MTA clearly does not have "continuous and systematic" contacts with the State of Minnesota. With regard to the first *Burlington* factor, the quality and nature of the above two (2) incidental contacts with Minnesota residents are clearly random, fortuitous, attenuated, and completed unrelated to the allegations in the Complaint. With regard to the second *Burlington* factor, MTA has had two (2) meager contacts with the State of Minnesota in four (4) years. Such isolated transactions are not sufficient to confer general jurisdiction over MTA. *See, e.g., Johnson v. Arden*, 614 F.3d 785, 797 (8th Cir. 2010) (mere transaction of interstate business insufficient to confer general jurisdiction over nonresident defendant).

With regard to the "secondary" *Burlington* factors ((4) the interests of the forum state in providing a forum for its residents; and (5) the convenience of the parties), these factors also weigh heavily against the exercise of general jurisdiction over MTA (as well as the other Britto Parties). MTA reasserts and re-alleges the arguments made on behalf of BCI in the above analysis of the fourth and fifth *Burlington* factors on pages 10-12 *supra*, as if set forth in their entirety herein. In light of all the above, there are simply no credible grounds for this Court to exercise general jurisdiction over MTA.

**<u>No Grounds for General Jurisdiction Over The Artist</u>**

Plaintiff has not alleged, and will not be able to establish, that the Artist in his individual capacity has continuous and systematic contacts with the State of Minnesota. Such contacts simply do not exist.

The Artist is a resident of the State of Florida. Artist Declaration, ¶ 3; Pomares Declaration, ¶ 4; Widmar Declaration, ¶ 4. The Artist in his individual capacity has had **no** contacts with the State of Minnesota, let alone contacts that are "continuous and systematic." The Artist has never lived in or visited the State of Minnesota. Artist Declaration, ¶ 4-5. He does not have any bank accounts or property in Minnesota. ¶ 4. The Artist has never incurred or paid taxes in Minnesota. *Id*. Nor does the Artist have a business, office, telephone number, or any other presence in Minnesota. *Id*. Indeed as of the date of this filing, the Artist's only commentable contact with the State of Minnesota is being frivolously named in Plaintiff's lawsuit. It is well-established that when the only contacts between a non-resident and the forum state are related to the dispute that give rise to the lawsuit, those contacts are insufficient as a matter of law to subject the non-resident to general jurisdiction in that state. *Bell Paper Box*, 22 F.3d at 819. Thus, there is no basis by which this Court can exercise general jurisdiction over the Artist. Given that contact with Minnesota is non-existent, any exercise of general jurisdiction over the Artist is unwarranted under the first two *Burlington* factors.

With regard to the "secondary" *Burlington* factors ((4) the interests of the forum state in providing a forum for its residents; and (5) the convenience of the parties), these factors also weigh heavily against the exercise of general jurisdiction over the Artist (as well as the other Britto Parties). The Artist reasserts and re-alleges the arguments made on behalf of BCI and MTA in the above analysis of the fourth and fifth *Burlington* factors on pages 10-12 *supra*, as if set forth in their entirety herein. In light of all the

above, there are simply no credible grounds for this Court to exercise general jurisdiction over the Artist.

**(ii) There is No Basis Upon Which the Court Can Assert Specific Personal Jurisdiction over the Britto Parties.**

None of the Britto Parties have engaged in any conduct with the State of Minnesota that could be characterized as anything more than random, fortuitous, or attenuated. As such, general personal jurisdiction over the Britto Parties in Minnesota will not lie and would offend traditional notions of fair play and substantial justice. Accordingly, the burden is on Plaintiff to establish that the Britto Parties are subject to this Court's specific personal jurisdiction. *Dever*, 380 F.3d at 1074 (once non-resident challenges the court's exercise of personal jurisdiction, the plaintiff shoulders the burden of establishing personal jurisdiction with specific facts as shown by testimony, affidavits, or other documentation). As explained immediately below, Plaintiff has not, and cannot, make such a showing.

"Specific jurisdiction is proper only if… the defendant purposefully directed its activities at the forum state and the claim arose out of or relates to those activities." *Johnson*, 614 F.3d at 794-95 (quotations omitted); *see also Burlington Industries*, 97 F.3d at 1103. To establish minimum contacts for specific personal jurisdiction, the Plaintiff must demonstrate that his alleged injury directly arises out of activity by the Britto Parties that was purposefully directed at the State of Minnesota. *Id*. Thus, the critical inquiry is whether the alleged conduct by the Britto Parties complained of in the Complaint *took place in* or was *directed at* the State of Minnesota. *Guinness Import Co.*, 153 F.3d at

614-615 (emphasis added). Plaintiff's Complaint is devoid of any allegations that indicate or give rise to an inference that his alleged injuries arise out of the Britto Parties' purposeful activities in the State of Minnesota.

As a preliminary matter, none of BCI's nor MTA's periodic and attenuated contacts with Minnesota set out in pages 7 to 14 above have anything whatsoever to do with the alleged injury Plaintiff complains of, and cannot serve to support specific jurisdiction over Plaintiff's unrelated claims against the Britto Parties. As a threshold matter, it is important to point out that "[e]ach defendant's contacts with the forum State must be assessed individually." *Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n. 13 (1984). Thus, Plaintiff bears the burden of making three separate *prima facie* showings of specific jurisdiction: one for BCI, one for MTA, and one for the Artist. *Id*. The Complaint does not contain a single allegation with regard to activity by either BCI or the Artist that was purposefully directed at the State of Minnesota. Plaintiff cannot indiscriminately lump BCI and the Artist in as defendants to Plaintiff's alleged claims for negligence and intentional misrepresentation (which must meet the Rule 9 standard for heightened pleading requirements, discussed more fully in the Rule 12(b)(6) Motion to Dismiss *infra*) without alleging any conduct by BCI or the Artist. *Steinbuch*, 518 F.3d at 590 ("…the complaint must contain sufficient facts, as opposed to mere conclusions, in support of the legal requirements of the claim to avoid dismissal."). Because the Complaint alleges no pertinent conduct on the part of BCI or the Artist, the exercise of specific jurisdiction over BCI or the Artist by Minnesota automatically fails the test of

constitutional due process. *Keeton*, 465 U.S. at 781 n. 13 (1984) ("Each defendant's contacts with the forum State must be assessed individually.")

Based on the contents of the Complaint, the only Britto Party that can possibly be construed to have directed its activities in any fashion toward the State of Minnesota is MTA, by way of its alleged communications with Plaintiff. *See* Complaint, ¶¶ 17-18; 20; 26; and 35. The gravamen of the Complaint can be summarized as follows: Plaintiff was allegedly defrauded by Florida residents the Roberts Defendants. The Roberts Defendants sold to Plaintiff counterfeit paintings falsely attributed to the Artist and Peter Max (another well-known pop artist). Plaintiff in turn sold these counterfeit paintings to third parties, allegedly without knowledge that such paintings were fake. In the course of the fraudulent scheme, the Roberts Defendants fabricated counterfeit certificates of authority for the forged paintings, and in order to keep the scheme going, used the internet to impersonate various individuals who would "vouch" for the Roberts Defendants. Plaintiff alleges unspecified damages resulting from the foregoing.

The Complaint does not allege any fact that establishes or even raises an inference that MTA was in any way whatsoever involved with the unilateral actions of Plaintiff purchasing fraudulent artwork from the Roberts Defendants, or the unilateral actions of the Roberts Defendants making multiple misrepresentations regarding the source of such fraudulent artwork. On the contrary, MTA's alleged liability in this case allegedly stems from (1) allegedly being the winning bidder of Plaintiff's eBay auction selling one of the fake "Britto" paintings that was supplied to Plaintiff by the Roberts Defendants (the "eBay Fake"), which Plaintiff submits constitutes a cause of action for negligent

misrepresentation; and (2) allegedly breaching an alleged duty to police the worldwide art marketplace for counterfeit items and achieve perfect intelligence and enforcement within approximately 60 days of commencing an alleged, presumed investigation, which Plaintiff submits constitutes a cause of action for negligence.

When a plaintiff alleges that a nonresident has committed a tort that harms the plaintiff in his or her home state, the 8th circuit applies, in addition to the *Burlington* factors, the "effects" test articulated in *Calder v. Jones*, 465 U.S. 783, 789 (1984). *Johnson*, 614 F.3d at 796. In the 8th Circuit, the "effects" test provides that

> a defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie case showing that the defendant's acts (1) were intentional, (2) were "uniquely" or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered — and which the defendant knew was likely to be suffered — there.

*Id*.

Plaintiff's negligence claim fails the *Calder* test, as the Complaint does not allege that MTA's alleged breach of its alleged "duty" to "obtain fraudulent art" was intentional. Complaint, ¶ 77. Furthermore, Plaintiff's negligence complaint appears to be trying to assert a theory of liability based upon the Britto Parties' litigation against the Roberts Defendants in Florida, not upon any conduct aimed or directed at Minnesota.

With regard to MTA's alleged conduct undergirding Plaintiff's negligent misrepresentation claim, [4] it is impossible to characterize MTA's alleged bidding on a

[4] While Count Four of Plaintiff's Complaint is titled "Intentional Misrepresentation," it appears that, at least as far as the Britto Parties are concerned, Plaintiff is attempting to assert a claim for negligent misrepresentation. To wit, Plaintiff states that: "[The Britto

forged painting located in Minnesota, presumably as part of a program to investigate counterfeit items found around the world attributed to the Artist, as an act that was "expressly" aimed at the State of Minnesota, and that MTA "knew" that such an investigation would cause "harm" to Plaintiff, who was admittedly selling fraudulent art. *Lindgren v. Gdt, LLC*, 312 F.Supp.2d 1125 (S.D. Iowa 2004) (facts of a case do not meet the "express aiming" requirement of Calder where non-resident defendant did not intentionally direct its activities at the forum state knowing that the plaintiff could be harmed by such activity).

To establish specific jurisdiction over MTA, MTA's alleged activities recited above "must lead directly to the injury suffered [by the Plaintiff]." *Zoltak v. Walgreen Co.*, 479 N.W.2d 741, 744 (Minn. App. 1992). Plaintiff admits he first bought fraudulent artwork attributed to the Artist in May of 2009. Plaintiff first alleges conduct attributable to MTA or any other Britto party to have occurred in September 2009. The Complaint makes no mention of how many fraudulent "Britto" paintings Plaintiff bought and sold from May 2009 to September 2009, but it can be presumed that of the total 43 pieces of fraudulent "Britto" art that Plaintiff admits he sold, and of the total 22 pieces fraudulent "Britto" pieces Plaintiff admits he still has in his possession, the majority of the

---

Parties] *in the course of their business/profession* supplied false information to Plaintiff in the form of pretending to be a legitimate buyer with regard to the purchase of fraudulent Britto artwork from Plaintiff… and *failed to use reasonable care or competence* in obtaining the information directly from Plaintiff or communicating it to Plaintiff[.]" The verbiage in italics is indicative of a negligent misrepresentation claim, not an intentional misrepresentation claim. Thus this motion and memorandum treats Count 4 as a negligent misrepresentation claim, as it appears that is what Plaintiff was actually trying to articulate.

transactions took place before September 2009. Plaintiff does not allege that the eBay buyer/seller transaction creates a special relationship between the parties. Plaintiff's assertion that he relied upon the sale of a painting via eBay to an unidentified third party as evidence of the painting's authenticity is unreasonable as a matter of law. In light of these considerations, there is simply no credible basis for Plaintiff to assert that MTA's alleged activity in bidding on and purchasing fake art located in Minnesota in September 2009 lead directly to the injuries he has allegedly suffered.

Plaintiff has failed to make a showing that would justify this Court's exercise of specific jurisdiction. Orderly administration of justice requires that a non-resident have engaged in conduct in a forum state such that he, she, or it should reasonably anticipate being haled into court there. *World-Wide Volkswagen,* 444 U.S. at 297. The exercise of specific jurisdiction over MTA based upon the allegations in the Complaint, which fail to establish that MTA expressly aimed its conduct toward the State of Minnesota, or that MTA's conduct lead specifically to the injury Plaintiff complains of, does not comport with the constitutional safeguards protecting citizens from being haled into a distant jurisdiction with which they have no significant contact. *Id*. MTA is not subject to specific personal jurisdiction in the State of Minnesota, nor are BCI or the Artist.

### B. Plaintiff's Claims Against the Britto Parties Must Be Dismissed for Failure to State a Claim Upon Which Relief Could be Granted.

If the Court's lack of personal jurisdiction were not enough to dismiss the claims against the Britto Parties, Plaintiff's failure to state claims upon which relief can be granted also requires dismissal under Fed. R. Civ. P. 12(b)(6).

To survive a 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Generally, the factual allegations within the four corners of the complaint are presumed true for the purposes of a 12(b)(6) analysis. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. *Id* at 664.

Plaintiff asserts two claims against the Britto Parties: negligent misrepresentation and negligence.

### 1. Plaintiff Fails to State a Claim of Negligent Misrepresentation[5]

"Under Minnesota law, any allegation of misrepresentation, whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation, is considered an allegation of fraud which must be pled with particularity." *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010); *see also Fed. R. Civ. P.* 9. This means that Plaintiff must allege with particularity who made the representations, what the representations specifically were, when they were made, whether and how he reasonably relied on those representations, and what damages were suffered. *City of Maple Grove v. Marketline*

[5] Please see Note 4, *supra*, regarding the mislabeling of Plaintiff's negligent misrepresentation claim as a claim for "Intentional Misrepresentation."

*Construction Capital, LLC*, 802 N.W.2d 809, 817 (Minn. App. 2011). The allegations of Plaintiff's Complaint fall egregiously short of stating a claim for negligent misrepresentation, either under a regular pleading standard or the heightened standard under Fed. R. Civ. P. 9.

The Minnesota Supreme Court recently clarified that to succeed on a claim of negligent misrepresentation, the plaintiff must establish: "(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplied false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information." *See Williams v. Smith*, 2012 Minn. LEXIS 393 (Minn. 2012). Plaintiff mechanically recites the preceding five elements in Paragraph 68 of the Complaint. Aside from that, the Complaint alleges no specific facts whatsoever that actually support the conclusory recitation.

**<u>The Complaint Does Not Allege the Required of Element of Duty of Care</u>**.

A duty of care is an essential element of a negligent misrepresentation claim. *Williams* at 23. Whether a duty of care exists in a particular relationship is a question of law. *Id*. To impose a duty of care, courts must examine the legal relationship between the parties and determine whether it is the type of relationship entitled to legal protection. *See id.* at *30, *39. If a duty exists in a given case, it is derived from the legal relationship between the parties and a determination that the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Williams*, 2012 Minn. LEXIS at *24-*25. When analyzing this relationship, the courts look to the status of the relationship at the time of the disputed representation. *See id.* at 30. The facts alleged in the Complaint

cannot establish that there was a duty of care owed from the Britto Parties to Plaintiff, because the Complaint does not adequately allege any kind of relationship between Plaintiff and the Britto Parties, let alone a relationship that would give rise to a duty of care. Plaintiff's vague allegation that an unidentified person allegedly associated with MTA ("Guiccign@hotmail.com")[6] bought one of his fake paintings via eBay is not enough to establish the existence of a duty of care owed by the Britto Parties to Plaintiff with particularity.

**The Complaint Does Not Allege that The Britto Parties Supplied False Information.**

The Complaint does not allege that any of the Britto Parties supplied false information to Plaintiff for the purpose of guiding Plaintiff in his business transactions. On the contrary, according to the face of the Complaint, every alleged interaction that is described with any particularity or specificity involving any alleged Britto Party actually resulted in Plaintiff obtaining true and accurate information. To wit:

- Plaintiff alleges that in September 2009, an unidentified person allegedly associated with MTA ("Guiccign@hotmail.com") was the winning bidder of Plaintiff's eBay auction selling one of the fake "Britto" paintings that was supplied to Plaintiff by the Roberts Defendants (the "eBay Fake"). (Plaintiff

[6] Plaintiff does not actually specifically allege that "Guiccign@hotmail.com" was associated with MTA. Rather, Plaintiff obliquely states "Plaintiff later found out that the buyer Guiccign had the same address as Magical Thinking Art, Inc. [.]" The Britto Parties disclaim any knowledge of or relationship with "Guiccign@hotmail.com". Any alleged association between "Guiccign@hotmail.com" and MTA discussed herein is presumed merely for the sake of argument and because for the purposes of the 12(b)(6) analysis prior to any evidentiary hearing, the Complaint must be construed in the light most favorable to Plaintiff. *Smith ex re. VanBrunt v. Blitz U..S.A. Inc.*, Civ. No. 11-1771 (D. Minn. November 6, 2012)

admits that Plaintiff sold multiple counterfeit paintings attributed to the Artist.) Complaint, ¶ 17. "Guiccign@hotmail.com" then sent Plaintiff an email asking if the eBay Fake had a certificate of authenticity with a raised seal. The email from "Guiccign@hotmail.com" **stated that original paintings by the Artist have a certificate of authenticity with a raised seal**. Complaint, ¶ 18. Plaintiff does not allege that this information supplied by "Guiccign@hotmail.com" was false.

- On December 9, 2009, Plaintiff allegedly received a phone call from an MTA representative named Jessica. Plaintiff admits that Jessica put Plaintiff on notice **in clear and no uncertain terms that the paintings that Plaintiff was selling on eBay and attributing to the Artist were not authentic works of the Artist**, and Jessica instructed Plaintiff to remove these forgeries from eBay. Complaint, ¶ 26. Plaintiff does not allege that this information supplied by Jessica was false.

- On December 30, 2009 an unidentified client of Plaintiff forwarded Plaintiff an email purporting to be from the Artist, and originating from the email address "Romero@RomeroBrittoCentral.com" (the "Fake Artist Email"). Complaint, ¶ 34. On that same day, Plaintiff allegedly received an email from MTA's Jessica **advising that the Fake Artist Email was not sent by the Artist, but from an imposter**. Plaintiff also allegedly spoke with Jessica over the telephone regarding the Fake Artist Email. Plaintiff does not allege that any of this information supplied by Jessica was false.

Clearly, to the extent that Plaintiff alleges any facts with particularity, none of these allegations establish the provision of false information by a Britto Party, or anyone alleged to be associated with a Britto Party.

**Plaintiff's " 'Guiccign@hotmail.com' Made a Misrepresentation Through Omission" Theory is Untenable and Fails to Support a Negligent Misrepresentation Claim.**

To the extent that Plaintiff seeks to rely on the allegation that "Guiccign@hotmail.com" supplied false information to Plaintiff "in the form of pretending to be a legitimate buyer with regard to the purchase of fraudulent Britto artwork from Plaintiff that [it] knew was forged by [the Roberts Defendants]," this cannot support Plaintiff's negligent misrepresentation claim either. First of all, as discussed in Note 6, Plaintiff does not even make a specific allegation as to what relationship, if any, exists between any of the Britto Parties and "Guiccign@hotmail.com".

Even if we indulge the deficient allegations, and presume, for the sake of argument and the purposes of the 12(b)(6) analysis, that the alleged association between "Guiccign@hotmail.com" and MTA exists, Plaintiff makes no specific averments as to the nature of the relationship, or that the actions of "Guiccign@hotmail.com" should somehow be imputed to MTA or any of the other Britto Parties.

Taking the indulgence even one step further for the sake of argument, and even presuming (1) a relationship between "Guiccign@hotmail.com" and the Britto Parties, and (2) that the relationship was of such a character that the actions of "Guiccign@hotmail.com" should somehow be imputed to one or more of the Britto Parties, like MTA, Plaintiff still does not supply any facts that would indicate how

"Guiccign@hotmail.com's" act of bidding on Plaintiff's eBay Fake was a "misrepresentation," and that "Guiccign@hotmail.com" was "pretending to be a legitimate buyer." The theory appears to be that during the time when "Guiccign@hotmail.com" was bidding and communicating with Plaintiff regarding the eBay Fake, "Guiccign@hotmail.com" knew to a degree of absolute certainty that the item in question was a forgery. However, aside from conclusory statements, Plaintiff alleges no facts to indicate that "Guiccign@hotmail.com" actually knew the painting he/she/it was bidding on was fake. It is plain from the face of Plaintiff's Complaint that if indeed "Guiccign@hotmail.com" was actually affiliated with any of the Britto Parties, he/she/it was obviously conducting an investigation into a potentially fraudulent "Britto" painting. There is nothing "deceitful" about such an investigation, nor is there any duty to disclose the investigative mission to the party selling the painting. *See Coach v. Angela's Boutique*, Civil Action No. H-10-1108 (June 15, 2011 S.D. Tex.) (no duty to disclose investigative mission to store that was selling counterfeit goods).

Furthermore, it is well established that silence is not actionable in claims for intentional or negligent misrepresentation unless the "silent" party was under a legal or ethical obligation to disclose information. *See American Computer Trust Leasing v. Jack Farrell Implement Co.*, 763 F. Supp. 1473, 1486 (D. Minn.1991), *aff'd,* 967 F.2d 1208 (8th Cir.), *cert. denied,* 506 U.S. 956, 113 S. Ct. 414, 121 L.Ed.2d 338 (1992). Plaintiff does not allege any special relationship or that "Guiccign@hotmail.com" owed him any such obligation, and indeed, under the facts of the Complaint, as matter of law he cannot.

One case to illustrate this is *Coach v. Angela's Boutique*, Civil Action No. H-10-1108 (June 15, 2011 S.D. Tex.). In *Coach*, the plaintiff asserted an implausible theory of liability that is remarkably similar to Plaintiff's here. In *Coach*, Coach, Inc. ("Coach") sued Angela's Boutique ("Angela's") for selling counterfeit Coach bags. Angela's then filed a counterclaim and third-party complaint for negligent misrepresentation[7] against the private investigation firm that Coach had hired to gather evidence of Angela's sale of counterfeit Coach bags. Angela claimed that the P.I. firm and Coach were liable for Angela's continued sale of counterfeit Coach products, because the private investigators did not disclose to Angela's their role as private investigators, did not disclose their investigative mission in visiting Angela's store, and did not notify Angela's that it was prohibited from selling counterfeit handbags or take any measures to physically prevent Angela's from such sale. *Id.*, at Page 7. Similarly, it appears to be Plaintiff's position that "Guiccign@hotmail.com" is liable for Plaintiff's continued sale of counterfeit "Britto" paintings by not disclosing the presumably investigative nature of he/she/it bidding on Plaintiff's auction.

This theory of legal liability is wholly untenable. As the court in *Coach* astutely noted, "when the alleged misrepresentation is a failure to speak," a plaintiff must prove

[7] The elements of a negligent misrepresentation claim under Texas law are similar to that under Minnesota law. The elements are: (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Coach*, Page 6, *citing Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 2011 WL 1226100, at *18 (Tex. Apr. 1, 2011).

that the defendant had a duty to disclose. *Id*. The *Coach* court found that "[t]he facts alleged defeat liability, as a matter of law. [The investigative firm] had no duty to inform Angela's Boutique of [its] purpose in visiting the shop or [its] relationship to Coach." Similarly, there was no duty here for "Guiccign@hotmail.com" to disclose to Plaintiff the reason behind his/her/its purchase, and Plaintiff has not alleged any facts that could possibly establish such a duty. As such, Plaintiff cannot make out a claim for negligent misrepresentation sufficient to withstand a 12(b)(6) motion to dismiss.

**Plaintiff Cannot Establish "Reasonable Reliance."**

Plaintiff further fails to make any specific allegation as to how Plaintiff reasonably relied upon any alleged misrepresentation to his detriment or what specific damages Plaintiff suffered on account of such alleged detrimental reliance. Reliance is a crucial element of an intentional or negligent misrepresentation claim. *City of Maple Grove v. Marketline Constr. Capital, LLC*, 802 N.W.2d 809, 817 (Minn. App. 2011). Reliance is generally evaluated in the context of the allegedly aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue. *Sierra Petroleum Co. v. Beaudry Oil & Serv. Inc.*, (D. Minn. 2011), *citing Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 367 (Minn. 2009). Plaintiff makes the bare and conclusory allegation that "Plaintiff relied on the information submitted by [the Britto Parties]… that the questions they had about the artwork were answered and that the artwork was legitimate and continued to sale [sic] such artwork to its customers." Complaint, ¶ 68.

As already established above, there is no allegation that any Britto Party was involved with the eBay transaction in question. "A complaint which lumps all defendants

together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F.Supp.2d 821, 832 (D. Minn. 2012).

To the extent that Plaintiff alleges reasonable reliance upon the alleged actions of "Guiccign@hotmail.com", Plaintiff is a sophisticated business person and was put on notice early and often that something was amiss with paintings he acquired from the Roberts Defendants. According to Plaintiff's Complaint, the months of September, October, and November 2009 (up to the day in December 2009 when Plaintiff admits that he was put on unequivocal notice that the Roberts Defendants sold him counterfeit paintings) were fraught with bizarre interactions with the Roberts Defendants and other third parties that would have put any prudent business person on reasonable notice that his initial due diligence into the Roberts Defendants had been inadequate. For Plaintiff to assert that in the face of all the shenanigans set forth in the Complaint, that he, a sophisticated businessman, relied on the fact that an anonymous eBay buyer purchased a painting from him as evidence that his stock of artwork from the Roberts Defendants must be legitimate and authentic is unreasonable as a matter of law. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d at 370.

In all Plaintiff fails to allege the essential elements of false information, duty to disclose, and reasonable reliance, in addition to failing to plead his negligent misrepresentation claim with the required specificity. In light of the foregoing, Plaintiff's negligent misrepresentation claim fails for lack of particularity as to the Britto Parties, as

well as for failure to properly allege facts to satisfy the required elements of a prima facie cause of action. The claim is properly dismissed as to all Britto Parties.

**2. Plaintiff Fails to State a Claim for Negligence.**

Count Five of Plaintiff's Complaint alleges a claim of negligence against the Britto Parties. "The essential elements of a negligence claim are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995).

It is not clear from the face of Plaintiff's Complaint what duty was allegedly owed from the Britto Parties to Plaintiff, or how that duty was breached. There are conclusory allegations, but no clear articulation of marshaled facts that would state a cause of action. For example, Paragraph 74 makes the conclusory and bare allegation that "[the Britto Parties] were aware of the fraudulent activities of [the Roberts Defendants] well before disclosing such activities to Plaintiff but failed to disclose these activities for at least four months causing Plaintiff to continue to sell fraudulent Britto works of art to its [sic] customers." The entirety of the Complaint, however, contains no specific facts as to this alleged situation. The Complaint alleges no facts as to ***how*** the Britto Parties allegedly knew about the Roberts Defendants' fraudulent activities, nor ***when*** the Britto Parties allegedly learned of the Roberts' Defendants' fraudulent activities (or what "four months" are being referred to), nor ***why*** the Britto Parties would owe a duty to Plaintiff, an unknown person, to disclose information to Plaintiff (presuming *arguendo* the Britto Parties had knowledge at a pertinent time). This vacuum of information fails to state a

claim for negligence as a matter of law. It is axiomatic that a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. 662, 663. To the extent that Plaintiff is re-asserting the facts regarding "Guiccign@hotmail.com" from the negligent misrepresentation claim, that claim fails as a general negligence cause of action for the reason explained above, namely that the Complaint alleges no cognizable duty. The existence of a duty is a threshold matter to a negligence claim. *Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 672 (Minn. 2001).

The only other allegation that can be made out in Plaintiff's Negligence count is that "[the Britto Parties] affirmatively created a duty to obtain all fraudulent art work sold by [the Roberts Defendants] and have them destroyed when they brought a lawsuit against the [the Roberts Defendants]." In other words, according to Plaintiff, an intellectual property owner, when it files a civil action for copyright infringement, creates a new duty for itself to hunt down, confiscate, and eliminate from existence all unauthorized copies in the world allegedly related to the infringer, no matter where located or how they got there. It is not clear to whom this new duty would be owed, but it appears, according to Plaintiff, the world at large. This proposition is a novel wholecloth fabrication. There simply exists no legal authority anywhere standing for such a hypothesis. Plaintiff's assertion in this regard is so outlandish, it is impossible to cite to authority refuting it, because, as a legal nullity, it has never been addressed by any court. Because the existence of a legal duty is a threshold requirement for stating a negligence

claim, Plaintiff's assertion of a duty that does not exist cannot support his cause of action. *Funchess*, 632 N.W.2d at 672.

There is no discernable claim for negligence against the Britto Parties asserted in Plaintiff's Complaint. To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Id*., and "more than a sheer possibility that a defendant has acted unlawfully." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir.2011) (internal quotation and citation omitted). Because the Court must disregard the Complaint's conclusory allegations, on the facts alleged, Plaintiff's Complaint clearly fails to meet this "plausibility" standard with regard to the Britto Parties.

If that were not enough, Plaintiff's Complaint is also incoherent as to the Britto Parties, for both the negligence and negligent misrepresentation claims. "A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F.Supp.2d 821, 832 (D. Minn. 2012). As stated above, the Complaint lumps all the Britto Parties together, and makes no attempt to put each party on notice of its alleged conduct so that they might know what is actually being alleged against them to prepare a proper defense.

For all the reasons stated above, Plaintiff's claims against the Britto Parties must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). Because there is no way that the facts alleged by Plaintiff can be corralled to state any cognizable cause of action, Plaintiff's

claims against the Britto Parties should be dismissed with prejudice, as amendment would be futile. *See Kozohorsky v. Harmon*, 332 F.3d 1141, 1144 (8th Cir. 2003) (a court may properly deny a party's motion to amend when the amendment would be futile).

## IV. CONCLUSION

Based on the foregoing, Defendants, BRITTO CENTRAL, INC., MAGICAL THINKING ART, INC., and ROMERO BRITTO respectfully request that this Court enter an Order: (i) granting their Motion to Dismiss; (ii) taxing fees and costs incurred in bringing this Motion against Plaintiff; and (iii) granting such other and further relief as this Honorable Court deems just and proper.

Respectfully submitted,

Dated: February 19, 2013

/s/ Mikhael Ann Bortz
Mikhael Ann Bortz
Florida Bar No. 33285
(*Admitted Pro Hac Vice)*
BRITTO CENTRAL, INC.
150 NW 25th Street
mikhael@britto.com
Telephone: (305) 938-2857
Telecopier: (786) 334-6123

*-And-*

SEVERSON, SHELDON, DOUGHERTY
& MOLENDA, P.A.

By: s/William M. Topka
William M. Topka, #0339003
Robert B. Bauer, #227365
7300 West 147th Street, Suite 600
Apple Valley, Minnesota 55124
(952) 432-3136
topkaw@seversonsheldon.com

bauerr@seversonsheldon.com

*Attorneys for Britto Parties*